| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br>1437 Bannock Street, Rm 256<br>Denver, CO 80203 | |
| **KENNETH R. FISH,**<br><div align="right">Plaintiff,</div><br>**v.**<br><br>**GMAC MORTGAGE, LLC, a Delaware limited liability company; HOMECOMINGS FINANCIAL LLC, a Delaware limited liability company; and CASTLE, MEINHOLD & STAWIARSKI, LLC, a Colorado limited liability company.**<br><br><div align="right">Defendants.</div> | **▲ COURT USE ONLY ▲**<br><br>Case Number:<br><br>Division: |
| Attorneys for Plaintiff:<br><br>Stephen C. Nicholls, #30139<br>Nicholls & Associates, P.C.<br>1850 Race Street<br>Denver, CO 80206<br>(303) 329-9700, Ext. 109<br>(303) 329-6950 FAX<br>steve.nicholls@nichollslaw.com | |

**COMPLAINT FOR DAMAGES, PRELIMINARY AND PERMANENT INJUNCTION AND DECLARATORY RELIEF**

Kenneth R. Fish, by and through its attorneys, Nicholls & Associates, P.C., submits the following for his Complaint against the above named Defendants:

**I.**
**GENERAL ALLEGATIONS**

1.      Plaintiff, Kenneth R. Fish, is an individual and resident of the City and County of Denver, Colorado.

**EXHIBIT B1**

2.      Defendant GMAC Mortgage, LLC ("GMAC"), is a Delaware limited liability company authorized and doing business in the State of Colorado.

3.      Defendant Homecomings Financial, LLC ("Homecomings"), is a Delaware limited liability company authorized and doing business in the State of Colorado.   GMAC and Homecomings are affiliated companies.

4.      Castle Meinhold & Stawiarski, LLC ("Castle"), is a Colorado limited liability company organized for the practice of law within the State of Colorado.

5.      Plaintiff is the owner of residential real property located in the City and County of Denver, Colorado with a street address of 500 Hudson Street, Denver, Colorado    80220 ("the Residence").

6.      On or about April 11, 2006, Plaintiff executed an Adjustable Rate Note ("the Note") in the principal amount of $395,000.00 in favor of The Mortgage Outlet, a California corporation. A copy of the Note is attached hereto and incorporated herewith as **Exhibit A**.

7.      Also on or about April 11, 2006, Plaintiff, as mortgagor, executed a Deed of Trust granting a security interest in favor of The Mortgage Outlet, its successors and/or assigns to secure payment of the Note.  A copy of the Deed of the Trust is attached hereto and incorporated herewith as **Exhibit B**.

8.      The Note and rights under the Deed of Trust were subsequently sold, transferred or assigned by The Mortgage Outlet to an entity not a party to this action.

9.      In addition to the sale, transfer or assignment of the Note and Deed of Trust by The Mortgage Outlet , Homecomings, on or about June 1, 2006, became the "Loan Servicer," the entity entitled and obligated to collect and properly apply periodic payments due under the Note and in compliance with the Deed of Trust.

10.     On or about July 1, 2009, GMAC assumed the role of Loan Servicer subject to the same rights and obligations of Homecomings under the Note and Deed of Trust.

11.     In late 2007, Plaintiff experienced certain financial difficulties arising from the dissolution of a business venture and became delinquent on the payments required under the Adjustable Rate Note.

12.     On December 21, 2007, Plaintiff attempted to electronically pay all delinquent periodic payments and related contractual late charges through an electronic transfer of funds via the Homecomings website.  Payment via the Homecomings website was refused and Plaintiff was directed to contact Homecomings at it's customer service telephone number.

13.     As directed, Plaintiff did telephone Homecomings customer service on December 21, 2007.  Plaintiff was advised that on December 19, 2007, his mortgage account (the Note and Deed of Trust) had been referred to John Candelari, represented by Homecomings to be an attorney with defendant Castle Meinhold & Stawiarski, for the commencement of foreclosure proceedings.

14.     On December 21, 2007, Plaintiff was also advised that to "reinstate" the loan and avoid foreclosure on the Residence, certified funds in the amount of $10,239.06 for all outstanding payments, late charges and related fees, would need to be sent immediately to Homecomings.

15.     On December 21, 2007, Plaintiff was also advised that due to the referral to "attorney" Candelari, there could be additional charges for fees and costs for which Plaintiff would be responsible in addition to the $10,239.06 reinstatement payment.  As a result, Plaintiff agreed to have certified funds delivered by express overnight delivery to Homecomings for the reinstatement amount and to contact Mr. Candelari to discuss any fees and costs due his firm for services provided prior to delivery of the reinstatement funds to Homecomings.

16.     Immediately after his discussion with the Homecomings customer service representative, Plaintiff obtained cashier's check no. 368496 in the amount of $10,239.06 and sent it by FedEx for overnight delivery.  A copy of the FedEx Airbill and Official Check is attached hereto as **Exhibit C**.

17.     On December 21, 2007, Plaintiff also telephoned Castle Meinhold & Stawiarsky, LLC to speak with attorney Candelari.  During the telephone conversation with Castle employees, Plaintiff was informed of the following:

      a.     Castle did not employ an attorney named John Candelari;

      b.     Homecomings had referred Plaintiff's account to Castle on December 19, 2007 for the commencement of foreclosure proceedings but no action had been taken in the matter as of December 21, 2007; and,

      c.     Ms. Ericka Olson, an attorney with Castle, was the attorney responsible for the matter involving Plaintiff's account.

18.     Plaintiff attempted to speak with Ms. Olson but according to the message left by Ms. Olson for her voice messages, she was out of the office and would not return until December 26, 2007.

19.     Due to Ms. Olson's unavailability and Plaintiff's own holiday travel plans, a voice message was left for Ms. Olson disputing any default under the Note or Deed of Trust, advising Ms. Olson that Plaintiff had submitted the requested reinstatement amount due her client, informing Ms. Olson that Plaintiff would be unavailable until January 2, 2008, and requesting that Ms. Olson contact Plaintiff upon his return to Denver.

20.     As reflected by the correspondence dated December 21, 2007 attached hereto as **Exhibit D**, Plaintiff confirmed his activities with Homecomings and his voice message to Ms. Olson and faxed the same to Ms. Olson immediately.

21.     Homecomings received Plaintiff's reinstatement payment at 10:32 a.m. on December 22, 2007.

22.     Prior to leaving Colorado, Plaintiff mailed his personal check for the payment due on January 1, 2008. That check was received by Homecomings on December 28, 2007.

23.     On information and belief, Homecomings advised defendant Castle on December 28, 2007, that Plaintiff's account had been reinstated and Castle should close its file.

24.     On January 3, 2008, Ms. Olson telephoned Plaintiff to advise she had "good news." When asked, she stated, "Our client has instructed us to close our file and there will be no foreclosure." Written confirmation was promised but never received.

25.     Plaintiff reasonably relied upon Ms. Olson's representations of January 3, 2008 and took no further action prior to January 14, 2008.

26.     On January 14, 2008, Plaintiff received an e-mail from Homecomings stating Homecomings' records indicated Plaintiff's January, 2008 payment had not been received but if the payment had been submitted, Plaintiff could ignore the e-mail. Plaintiff did so.

27.     On January 15, 2008, Plaintiff received an automated telephone call from Homecomings indicating his January payment had still not been received.

28.     On January 16, 2008, Plaintiff spoke by telephone with "Rein" at Homecomings. Rein confirmed receipt of Plaintiff's check no. 3531 for the January, 2008 payment but claimed an additional $521.37 was still owed. When Plaintiff asked, "For what?", the phone line went dead.

29.     Shortly after his conversation with "Rein," Plaintiff was contacted by Ms. Olson. Ms. Olson stated it was her understanding that the check submitted by Plaintiff for his January payment was written in the amount of $2,792.62 and was therefore, $436.37 short. Plaintiff advised Ms. Olson that she had incorrect information and immediately forwarded her a copy of the check in the full amount of $3,228.99. After receipt of the copy of Plaintiff's January payment check, Ms. Olson agreed to obtain an accounting from Homecomings to clear up the confusion.

30.     Plaintiff had no further contact from anyone regarding this matter until January 19, 2008. On Saturday, January 19, 2008, despite the earlier representations made by Ms. Olson

January 3, 2008 regarding the "good news" that there would be no foreclosure, Plaintiff received notice from the Public Trustee for the City and County of Denver that Homecomings had filed a Notice of Election and Demand and a foreclosure sale of Plaintiff's residence was scheduled for February 28, 2008.

31.     On Monday, January 21, 2008, Plaintiff phoned attorney Olson who advised that her firm "screwed up" and filed the notice of election and demand.  Plaintiff offered to send the $436.37 earlier claimed to be due for January, 2008, subject to being returned to Plaintiff if not in fact due, but was advised by Ms. Olson to "sit tight" while she continued her investigation.

32.     On Tuesday, January 22, 2008, Plaintiff confirmed the Monday phone conversation in writing.  A copy of the correspondence is attached hereto as **Exhibit E**.

33.     Also on January 22, 2008, Plaintiff received another automated phone call from Homecomings still indicating the January payment had not been received but now asserting $4,153.74 was due.

34.     On January 23, 2008, Ms. Olson wrote to Plaintiff, stating, "I am still trying to get an accounting and answer from client regarding your file.  I understand completely how frustrating this is. I appreciate your patience. We will figure out what happened and get it resolved."

35.     From December 21, 2007 forward, Plaintiff requested an accounting of the amounts claimed to be due, apparently ranging from $436.37 to $4,153.74.  No accounting was forthcoming.

36.     On January 24, 2008, Plaintiff spoke to Rosa at Homecomings and was advised that she could not explain the latest demand for more than $4,100 and indicated that her record included "some strange note of an un-applied credit."

37.     On January 29, 2008, Plaintiff filed a formal notice of intent to cure with the Office of the Public Trustee.  Neither Ms. Olson nor anyone else ever responded to the notice.

38.     Between January 29, 2008 and February 12, 2008 Plaintiff repeatedly contacted Ms. Olson  seeking resolution of the dispute without response.

39.     On February 13, 2008, Plaintiff received e-mail correspondence from attorney Olson advising of his statutory rights to cure and indicating efforts were still be taken to resolve the issues.

40.     On February 25, 2008, Plaintiff had a lengthy conversation with Ramona at Homecomings who stated, "[s]omebody here at Homecomings made a mistake and misapplied one payment."  She also disclosed the amount of $2,013.40 had been paid to Castle instead of being applied to Plaintiff's account.

41.     On Tuesday, February 26, 2008, Plaintiff relayed the earlier phone conversation with Ramona in writing to attorney Olson questioning how in excess of $2,000 could have been earned by Castle  when the reinstatement payment was made prior to any action being taken with respect to the account and by her own admission, the foreclosure proceeding was commenced erroneously. A copy of the correspondence is attached hereto as **Exhibit F**.  Neither Ms. Olson nor anyone else from Castle responded.

42.     On March 27, 2008, Plaintiff received a phone call from attorney Katharine "Katie" Fisher advising that Ms. Olson was no longer with the Castle firm.  She advised that she was "trying to clean up" attorney Olson's files and that further communications should be directed to her.

43.     Reasonably relying on Ms. Fisher's representations that she and others at Castle were working to address and correct the mistakes made after December 21, 2007, and the agreement between Plaintiff and Ms. Fisher that future communications be limited to the two of them directly, Plaintiff did not respond to calls from various employees of Homecomings after March 27, 2008.

44.     By May 27, 2008, having heard nothing further from Ms. Fisher and have tried to reach her by telephone several times without success, Plaintiff e-mailed Ms. Fisher to request that she contact Plaintiff to resolve any remaining issues in dispute or to advise Plaintiff as to the progress she and/or others at Castle had accomplished to correct the earlier mistakes.

45.     On June 2, 2008, Plaintiff received correspondence from Ms. Fisher advising that no further corrective action would be taken despite the previous representations and Plaintiff's reliance upon the same.

46.     After payment of the requested reinstatement amount on December 21, 2007, all monthly payments required under the Note have been timely made as detailed below:

| Due Date | Paid Date | Check No. | Amount |
|----------|-----------|-----------|--------|
| 01/01/08 | 12/28/07 | 3531 | $3,228.99 |
| 02/01/08 | 01/28/08 | 3538 | $3,228.99 |
| 03/01/08 | 03/03/08 | 3544 | $3,228.99 |
| 04/01/08 | 03/25/08 | 3549 | $3,228.99 |
| 05/01/08 | 04/28/08 | 3563 | $3,228.90 |
| 06/01/08 | 06/10/08 | 3572 | $3,066.46 |
| 07/01/08 | 07/17/08 | 3578 | $3,204.17 |
| 08/01/08 | 08/25/08 | 3587 | $3,204.17 |

| Due Date | Paid Date | Check No. | Amount |
|----------|-----------|-----------|--------|
| 09/01/08 | 09/26/08 | 3862 | $3,204.17 |
| 10/01/08 | 10/20/08 | 3873 | $3,204.17 |
| 11/01/08 | 10/28/08 | 3879 | $3,066.46 |
| 12/01/08 | 11/25/08 | 3885 | $3,342.15 |
| 01/01/09 | 12/24/08 | 3891 | $3,342.15 |
| 02/01/09 | 01/27/09 | 3893 | $3,343.15 |
| 03/01/09 | 02/23/09 | 3900 | $3,342.15 |
| 04/01/09 | 03/25/09 | 3903 | $3,342.15 |
| 05/01/09 | 05/02/09 | 3909 | $3,342.15 |
| 06/01/09 | 05/26/09 | 3915 | $3,090.83 |
| 07/01/09 | 06/26/09 | 3801 | $3,090.82 |
| 08/01/09 | 07/27/09 | 3807 | $3,090.82 |
| 09/01/09 | 08/24/09 | 3814 | $3,090.82 |
| 10/01/09 | 09/25/09 | 3819 | $3,090.82 |
| 11/01/09 | 10/28/09 | 3823 | $3,090.82 |
| 12/01/09 | 12/07/09 | 3827 | $2,844.46 |
| 01/01/10 | 01/08/10 | 3832 | $2,844.46 |
| 02/01/10 | 01/29/10 | 3838 | $2,844.46 |
| 03/01/10 | 02/22/10 | 3841 | $2,844.46 |
| 04/01/10 | 04/07/10 | 3849 | $2,844.46 |
| 05/01/10 | 05/03/10 | 3853 | $2,844.46 |

47.    Section 2 of the Deed of Trust securing the loan provides for application of the payments above as follows:

**Application of Payments or Proceeds**.  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security

Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charges due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment plan of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payment.

48.     On and after December 22, 2007, Homecomings, and later, GMAC, have failed to comply with Section 2 of the Deed of Trust quoted above.

49.     Based upon the failures by Homecoming and GMAC to comply with Section 2 of the Deed of Trust between January 2008 and the present, Homecomings and GMAC have repeatedly and erroneously reported to various credit reporting agencies that Plaintiff's loan payments have been  30 and at times, 60 days past due.

50.     Plaintiff has received numerous letters from Homecomings and/or GMAC claiming his account is in default.

51.     Following a December 3, 2009 notice of default, Plaintiff, on December 15, 2009, sent a letter of dispute requesting GMAC provide a detailed accounting of the loan including documentation to support various charges assessed against the account.

52.     In response, GMAC provided a computer printout described as its "payment history" for the loan. The information provided offered little help in determining the accurate status of the loan.  The printout is difficult to follow, references unexplained codes, contains multiple circular entries and is not supported by any of the back up documentation Plaintiff specifically requested.
.
53.     Again, by letter dated March 11, 2009, Plaintiff renewed his request that documentation be provided evidencing the exact nature of the expenses charged against this account since December 2007;  including, without limitation, any invoices supporting such charges and the basis for which the expenses were deemed necessary.  In addition, a legible, un-coded accounting of funds received on the account and charges assessed by GMAC was requested.

54.     By letter dated April 6, 2010, GMAC again sent the computerized payment history, although this time, a separate page containing explanations for some of the codes was included.  No support documentation for the charges was provided.

55.     On April 13, 2010, Plaintiff sent formal letters of dispute under the Fair Credit Reporting Act.

56.     As a result of the late payments erroneously reported by GMAC , Plaintiff has been denied access to credit, including credit necessary for his ongoing business affairs.

## II.
## FIRST CLAIM FOR RELIEF
## BREACH OF CONTRACT

57.     Plaintiff hereby incorporates by reference all preceding paragraphs.

58.     Plaintiff and Defendant Homecomings and subsequently, GMAC, as "Loan Servicers," at all relevant times, have been parties to  a valid enforceable Promissory Note and Deed of Trust.

59.     Defendants Homecomings and  GMAC breached the terms of the Deed of Trust through the misapplication of payments made by Plaintiff on and after December 22, 2007.

60.     Defendants Homecomings and  GMAC breached the terms of the Promissory Note and Deed of Trust by assessing unnecessary, unreasonable and otherwise improper late fees and other miscellaneous charges to the mortgage account and then utilized payments made by Plaintiff to satisfy such improper assessments.

61.     The Note and Deed of Trust constitute a valid contract incorporating covenants of good faith and fair dealing which Defendants Homecomings and GMAC have breached.

62.     On and after December 21, 2007, Plaintiff performed his obligations under the terms of the Promissory Note and Deed of Trust.

63.     Plaintiff has suffered and continues to suffer damages and  losses as a result of Defendants' repeated breaches of the Promissory Note and Deed of Trust and the covenants of good faith incorporated therein.

64.     Defendants Homecomings and GMAC are jointly and severally liable to Plaintiff for all damages established at trial to have resulted from their breach of contract acts and omissions.

### III.
### SECOND CLAIM FOR RELIEF
### VIOLATION OF THE FAIR CREDIT REPORTING ACT

65.     Plaintiff hereby incorporates by reference all preceding paragraphs.

66.     Defendants Homecomings and  GMAC willfully or negligently violated the Fair
Credit Reporting Act, 15 U.S.C. 1681 *et seq.* by erroneously reporting:

a.      Plaintiffs payments were 30 days late for 12/07, 02/08, 05/08, 06/08, 07/08,
        08/08, 09/08, 10/08, 01/09, 04/09, 11/09 and 01/10;

b.      Plaintiff's payments were 60 days late for 07/07, 11/07 and 12/09;

c.      Any amount is past due; and

d.      Any payment due on or after December 1, 2007 was ever 30 days or more
        past due.

67.     Plaintiff has suffered actual  injuries, damages and other losses caused by
Defendants' erroneous credit reporting.

### IV.
### THIRD CLAIM FOR RELIEF
### NEGLIGENT MISREPRESENTATION

68.     Plaintiff hereby incorporates by reference all preceding paragraphs.

69.     Defendant Castle, in the course of its business, and through its employee, Ericka
Olson, acting in the course and scope of her employment, negligently failed to follow the
instructions of its client to close its file and on January 3, 2008, negligently misrepresented to
Plaintiff that no foreclosure action would be taken when in fact, a foreclosure proceeding had been
commenced by Castle on December 28, 2007.

70.     Defendant Castle, in the course of its business, and through its employees, Ericka
Olson and Katharine Fisher, acting in the course and scope of their employment, negligently
misrepresented that efforts would be and/or were being taken to correct the erroneous charges
assessed against Plaintiff's mortgage account as a result of the wrongfully initiated foreclosure.

71.     Defendant Castle, in the course of its business, and through its employees, Ericka Olson and Katharine Fisher, acting in the course and scope of their employment, supplied false information to Plaintiff in connection with the wrongful foreclosure and the resulting charges assessed against Plaintiff's mortgage account.

72.     Defendant Castle knew or should have known that Plaintiff would rely and did rely on the false information provided by Castle employees Ericka Olson and Katharine Fisher for Plaintiff's decisions as to whether to act or refrain from acting to resolve and/or minimize damages caused Plaintiff by the wrongful foreclosure and charges assessed against Plaintiff's mortgage account.

73.     Plaintiff did reasonably rely upon the representations by Defendant Castle.

74.     Defendant Castle failed to exercise reasonable care or competence in communicating material and accurate information to Plaintiff.

75.     Plaintiff has suffered actual injuries, damages and other losses caused by Defendant Castle's negligent misrepresentations.

76.     Defendant Castle is subject to liability for all pecuniary loss and damage incurred by Plaintiff and established at trial to have been caused by Castle's negligent misrepresentations.


## V.
## FOURTH CLAIM FOR RELIEF
## OUTRAGEOUS CONDUCT

77.     Plaintiff hereby incorporates by reference all preceding paragraphs.

78.     Defendants Homecomings and GMAC, through the misapplication of Plaintiff's payments, the assessment of unreasonable, unnecessary and otherwise wrongful charges. to Plaintiff's account, the false reporting to various credit reporting agencies and the willful refusal to correct their false reports and properly credit Plaintiff's account, and by continuing to assert that Plaintiff's account is in default and subject to various fees and charges, have engaged in and continue to engage in a course of conduct, which in its entirety, is extreme and outrageous.

79.     Defendants Homecomings and GMAC engaged in a course of outrageous conduct intentionally or with reckless disregard that such conduct would cause Plaintiff severe emotional distress.

80.     The outrageous conduct by Defendants Homecomings and GMAC has caused and will continue to cause Plaintiff severe emotional distress.

## VI.
## FIFTH CLAIM FOR RELIEF
## DECLARATORY RELIEF

81.     Plaintiff hereby incorporates by reference all preceding paragraphs.

82.     Notwithstanding the availability of and in addition to the other relief to which Plaintiff is entitled, C.R.C.P 57 establishes that Plaintiff is entitled to this Court's Declaratory Judgment providing that Plaintiff's mortgage account has not been in default after December 22, 2007 and that Defendant GMAC has no basis upon which to accelerate the Note and/or commence an action to foreclose upon the property securing the Note.

## VII.
## SIXTH CLAIM FOR RELIEF
## PRELIMINARY AND PERMANENT INJUNCTION

83.     Plaintiff hereby incorporates by reference all preceding paragraphs.

84.     Defendant GMAC continues to assert and report to others that Plaintiff has a substantial past due balance on his mortgage account.

85.     Defendant GMAC continues to allege that Plaintiff is in default and subject to the commencement of foreclosure proceedings.

86.     Plaintiff will suffer irreparable injury unless GMAC is preliminarily and permanently enjoined from continuing such actions and/or taking action based upon the same, including but not limited to the commencement of a foreclosure proceeding.
.

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment in his favor and against each defendant for all damages established at trial as reasonable and necessary to compensate Plaintiff for the harms and losses caused by each defendant together with all costs herein, reasonable attorney fees as provided by law, prejudgment interest on all damages awarded at the maximum lawful amount and such other and further relief as is proper under the circumstances

Plaintiff further respectfully demands declaratory and injunctive relief as set forth in Plaintiff's Fifth and Sixth Claims for Relief.

Respectfully submitted this 1st day of June, 2010.

By:  /s/ Stephen C. Nicholls
                        Stephen C. Nicholls, #30139
                        Attorney for Plaintiff
                        Signed Original Available For Inspection

Plaintiffs' Address:
500 Hudson Street
Denver, CO 80220

Identifier:7441328390        Doc Type:MTGR

MIN: 1001825-0006030181-6

EFILED Document
CO Denver County District Court 2nd JD
Filing Date: Jun  1 2010  4:47PM MDT
Filing ID: 31405804
Review Clerk: Stacey Johnson

Loan Number: 6030181

# ADJUSTABLE RATE RIDER
### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*)
### - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 11th day of APRIL, 2006 .
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to THE MORTGAGE OUTLET, A
CALIFORNIA CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and located at:

500 HUDSON ST, DENVER, COLORADO 80220

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT.  THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND
THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of      7.990 %. The Note provides for changes
in the interest rate and the monthly payments, as follows:

## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A)   Change Dates
The interest rate I will pay may change on the 1st   day of MAY, 2008       .
and on that day every 6th  month thereafter. Each date on which my interest rate could change is called
a "Change Date."

(B)   The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the
average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market
("LIBOR"), as published in *The Wall Street Journal*.  The most recent Index figure available as of the first
business day of the month immediately preceding the month in which the Change Date occurs is called the
"Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information.  The Note Holder will give me notice of this choice.

---

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
Single Family--Fannie Mae MODIFIED INSTRUMENT
Form 3138 1/01                         Page 1 of 3

DocMagic *eRorms* 800-649-1362
www.docmagic.com


EXHIBIT
A

Us3138.rid.1.rem

Identifier:7441328390          Doc Type:MTGR

**(C)   Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FOUR AND 890/1000                                percentage points (      4.890 %) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

**(D)   Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.990 % or less than      4.990 %.  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 000/1000                                percentage points (      1.000 %) from the rate of interest I have been paying for the preceding      6      months.  My interest rate will never be greater than 13.990 %.  My interest rate will never be less than      4.890 %.

**(E)   Effective Date of Changes**

My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)   Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
Single Family--Fannie Mae MODIFIED INSTRUMENT
Form 3138 1/01                                     Page 2 of 3

DocMagic *eFormns* 800-849-1362
www.docmagic.com

Us3138.rid.2.tem

Identifier:7441328390        Doc Type:MTGR

assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
KENNETH  R  FISH                -Borrower                                              -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                              -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                              -Borrower


MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
Single Family--Fannie Mae MODIFIED INSTRUMENT
Form 3138 1/01                                    Page 3 of 3

DocMagic eFormns  800-649-1362
www.docmagic.com

Us3138.rid.3.em

Identifier:7441328390        Doc Type:MTGR

# PREPAYMENT RIDER

Loan Number: 6030181

Date: APRIL 11, 2006

Borrower(s): KENNETH R FISH

      THIS PREPAYMENT RIDER (the "Rider") is made this 11th    day of APRIL    .
2006               , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure repayment of Borrower's promissory note (the "Note") in favor of
THE MORTGAGE OUTLET, A CALIFORNIA CORPORATION

("Lender"). The Security Instrument encumbers the Property more specifically described in the Security
Instrument and located at

### 500 HUDSON ST, DENVER, COLORADO 80220

[Property Address]

      ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A.    PREPAYMENT CHARGE**
    The Note provides for the payment of a prepayment charge as follows:

### 5  . BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE
      I have the right to make payments of Principal at any time before they are due.
A payment of Principal only is known as a "Prepayment." When I make a Prepayment,
I will tell the Note Holder in writing that I am doing so. I may not designate a payment
as a Prepayment if I have not made all the monthly payments due under the Note.
      The Note Holder will use my Prepayments to reduce the amount of Principal that
I owe under the Note. However, the Note Holder may apply my Prepayment to the
accrued and unpaid interest on the Prepayment amount, before applying my Prepayment
to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be
no changes in the due dates of my monthly payment unless the Note Holder agrees in
writing to those changes.
      If the Note contains provisions for a variable interest rate, my partial Prepayment
may reduce the amount of my monthly payments after the first Change Date following my
partial Prepayment. However, any reduction due to my partial Prepayment may be offset
by an interest rate increase. If this Note provides for a variable interest rate or finance
charge, and the interest rate or finance charge at any time exceeds the legal limit under

MULTISTATE PREPAYMENT RIDER
6/03                               Page 1 of 2                *DocMagic eFormm* 800-649-1362
www.docmagic.com

Identifier:7441328390          Doc Type:MTGR

which a Prepayment penalty is allowed, then the Note Holder's right to assess a Prepayment penalty will be determined under applicable law.

If within TWELVE          ( 12    ) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to SIX          ( 6     ) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider.

_____ (Seal)          _____ (Seal)
KENNETH R FISH          -Borrower          -Borrower

_____ (Seal)          _____ (Seal)
-Borrower          -Borrower

_____ (Seal)          _____ (Seal)
-Borrower          -Borrower

Usprepri.2.tem

Identifier:7441328390          Doc Type:NOTE

MIN: 1001825-0006030181-6                    Loan Number: 6030181

# ADJUSTABLE RATE NOTE
### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*)-Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

APRIL 11, 2006                SAN JOSE          CALIFORNIA
[Date]                        [City]            [State]

500 HUDSON ST, DENVER, COLORADO 80220
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $395,000.00        (this amount is called "Principal"), plus interest, to the order of Lender. Lender is THE MORTGAGE OUTLET, A CALIFORNIA CORPORATION
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    7.990 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the  1st  day of each month beginning on    JUNE 1 2006 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MAY 1, 2036   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 4595 CHERRY AVENUE, SAN JOSE, CALIFORNIA 95118
                                              or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $2,895.62        . This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE--LIBOR SIX-MONTH INDEX                    Form 3520 1/01
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)--Single Family        DocMagic ℰℱ②ℛℬ ⁻ ⁻.⁻¹ 800-649-1362
Fannie Mae MODIFIED INSTRUMENT              Page 1 of 5                  www.docmagic.com

Us3520 001.1.tem

Identifier:7441328390          Doc Type:NOTE



## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the 1st day of MAY, 2008 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding FOUR AND 890/1000 percentage points ( 4.890 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 10.990 % or less than 4.990 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 000/1000 percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 13.990 %. My interest rate will never be less than 4.890 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.   BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Note Addendum.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

MULTISTATE ADJUSTABLE RATE NOTE--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)--Single Family
Fannie Mae MODIFIED INSTRUMENT                    Page 2 of 5

Form 3520 1/01
DocMagic *eForms* 800-649-1362
www.docmagic.com

Us3520.nct.2.tem

Identifier:7441328390    Doc Type:NOTE





## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

MULTISTATE ADJUSTABLE RATE NOTE–LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)–Single Family
Fannie Mae MODIFIED INSTRUMENT                    Page 3 of 5

Form 3520 1/01
DocMagic *eFarms* 800-649-1362
*www.docmagic.com*

Us3520.not 3 tem

Identifier:7441328390          Doc Type:NOTE



## 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions read as follows:

    Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.     Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

    To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

    If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE NOTE–LIBOR SIX-MONTH INDEX                   Form 3520 1/01
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)–Single Family                DocMagic *℮*⒭ ⁑ ⸱⁌ 800-649-1362
Fannie Mae MODIFIED INSTRUMENT                      Page 4 of 5               www.docmagic.com

Identifier:7441328390          Doc Type:NOTE

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ X

_____ (Seal)          _____ (Seal)
KENNETH R FISH           -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                          -Borrower

*[Sign Original Only]*

MULTISTATE ADJUSTABLE RATE NOTE--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)--Single Family
Fannie Mae MODIFIED INSTRUMENT                    Page 5 of 5

Form 3520 1/01
DocMagic *e* ꞏ 800-649-1362
www.docmagic.com

Us3520.not.5.tem

Identifier:7441328390          Doc Type:NOTE

PAY TO THE ORDER OF _____

X _Filomena Oliveira_ WITHOUT RECOURSE

Filomena Oliveira
Asst. Vice President
The Mortgage Outlet

Identifier:7441328390       Doc Type:NOTE

# PREPAYMENT ADDENDUM TO NOTE

Loan Number: 6030181

Date: APRIL 11, 2006

Borrower(s): KENNETH R FISH

     THIS PREPAYMENT ADDENDUM TO NOTE (the "Addendum") is made this   11th   day of APRIL, 2006     , and is incorporated into and shall be deemed to amend and supplement that certain promissory note (the "Note") made by the undersigned ("Borrower") in favor of THE MORTGAGE OUTLET, A CALIFORNIA CORPORATION

("Lender") and dated the same date as this Addendum.  Repayment of the Note is secured by a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") given by Borrower in favor of Lender and dated the same date as this Addendum.  To the extent that the provisions of this Addendum are inconsistent with the provisions of the Note, the provisions of this Addendum shall supersede the inconsistent provisions of the Note.

     ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Note, Borrower and Lender further covenant and agree as follows:

     Section 5 of the Note is amended to read in its entirety as follows:

## 5 . BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE

     I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

     The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under the Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note.  If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes.

     If the Note contains provisions for a variable interest rate, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment.  However, any reduction due to my partial Prepayment may be offset by an interest rate increase.  If this Note provides for a variable interest rate or finance charge, and the interest rate or finance charge at any time exceeds the legal limit under which a Prepayment penalty is allowed, then the Note Holder's right to assess a Prepayment penalty will be determined under applicable law.

     If within   TWELVE  (  12  ) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to   SIX   (   6    ) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

Identifier:7441328390          Doo Type:NOTE



BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Addendum.

_4-11-06_

Borrower KENNETH R FISH          Date          Borrower          Date

Borrower          Date          Borrower          Date

Borrower          Date          Borrower          Date

Identifier:7441328390          Doc Type:NOTE

MIN: 1001825-0006030181-6          Loan Number: 6030181

## ADJUSTABLE RATE RIDER
**(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)**

THIS ADJUSTABLE RATE RIDER is made this 11th day of APRIL, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to THE MORTGAGE OUTLET, A CALIFORNIA CORPORATION ("Lender") of the same date and covering the property described in the Security Instrument and located at:

500 HUDSON ST, DENVER, COLORADO 80220

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of      7.990 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A)   Change Dates
The interest rate I will pay may change on the 1st   day of MAY, 2008 , and on that day every 6th   month thereafter. Each date on which my interest rate could change is called a "Change Date."
(B)   The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

MULTISTATE ADJUSTABLE RATE RIDER—LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) Single Family—Fannie Mae MODIFIED INSTRUMENT Form 3138 1/01          Page 1 of 3

DocMagic *CForms* 800-649-1362 www.docmagic.com

Us3138.rid.1.tem

Identifier:7441328390          Doc Type:NOTE

**(C)   Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FOUR AND 890/1000 percentage points ( 4.890 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)   Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.990 % or less than 4.990 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 000/1000 percentage points ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 13.990 %. My interest rate will never be less than 4.890 %.

**(E)   Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)   Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan

MULTISTATE ADJUSTABLE RATE RIDER–LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
Single Family–Fannie Mae MODIFIED INSTRUMENT
Form 3138 1/01                    Page 2 of 3

DocMagic ℰℛⅈⅇⅷ 800-649-1362
www.docmagic.com

Identifier:7441328390          Doc Type:NOTE

assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

   To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

   If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

   BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)     _____ (Seal)
KENNETH R FISH                    -Borrower                                      -Borrower

_____ (Seal)     _____ (Seal)
                                  -Borrower                                      -Borrower

_____ (Seal)     _____ (Seal)
                                  -Borrower                                      -Borrower

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
Single Family--Fannie Mae MODIFIED INSTRUMENT
Form 3138 1/01                        Page 3 of 3

DocMagic ℮Forms 800-649-1362
www.docmagic.com

Ul3138.rid.3 wm

# PREPAYMENT RIDER

Loan Number: 6030181

Date: APRIL 11, 2006

Borrower(s): KENNETH R FISH

THIS PREPAYMENT RIDER (the "Rider") is made this 11th day of APRIL 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure repayment of Borrower's promissory note (the "Note") in favor of THE MORTGAGE OUTLET, A CALIFORNIA CORPORATION

("Lender"). The Security Instrument encumbers the Property more specifically described in the Security Instrument and located at

500 HUDSON ST, DENVER, COLORADO 80220

[Property Address]

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PREPAYMENT CHARGE**

The Note provides for the payment of a prepayment charge as follows:

**5 . BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes.

If the Note contains provisions for a variable interest rate, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase. If this Note provides for a variable interest rate or finance charge, and the interest rate or finance charge at any time exceeds the legal limit under

Identifier:7441328390          Doc Type:NOTE

which a Prepayment penalty is allowed, then the Note Holder's right to assess a Prepayment penalty will be determined under applicable law.

If within TWELVE        ( 12     ) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to SIX        ( 6      ) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider.

_____ (Seal)          _____ (Seal)
KENNETH R FISH                    -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                -Borrower

Identifier:7441328390          Doc Type:MTGR

After Recording Return To:
THE MORTGAGE OUTLET
4595 CHERRY AVENUE
SAN JOSE, CALIFORNIA 95118
Loan Number: 6030181

**EFILED Document**
**CO Denver County District Court 2nd JD**
**Filing Date: Jun 1 2010 4:47PM MDT**
**Filing ID: 31405804**
**Review Clerk: Stacey Johnson**



2006074914
Page: 1 of 15
05/13/2006 09:16A
City & County Of Denver   DOT   R81.00   D0.00

[Space Above This Line For Recording Data]

## DEED OF TRUST



MIN:1001825-0006030181-6

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated APRIL 11, 2006        , together with all Riders to this document.
(B) "Borrower" is KENNETH R FISH

Borrower is the trustor under this Security Instrument.
(C) "Lender" is THE MORTGAGE OUTLET

Lender is a CALIFORNIA CORPORATION                                         organized
and existing under the laws of CALIFORNIA
Lender's address is 4595 CHERRY AVENUE, SAN JOSE, CALIFORNIA 95118

(D) "Trustee" is the Public Trustee of DENVER
                                                       County, Colorado.
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated APRIL 11, 2006         .
The Note states that Borrower owes Lender THREE HUNDRED NINETY-FIVE THOUSAND AND 00/100                              Dollars (U.S. $395,000.00       ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MAY 1, 2036         .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☒ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | PREPAYMENT RIDER TO SECURITY INST |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

EXHIBIT
B

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Trustee, in trust, with power of sale, the following described property located in the

COUNTY of:  DENVER

[Type of Recording Jurisdiction]                      [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 0607102005000

which currently has the address of   500 HUDSON ST

[Street]

DENVER                       , Colorado      80220      ("Property Address"):
[City]                                    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record and liens for taxes for the current year not yet due and payable.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:

1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Borrower shall also pay funds for Escrow Items pursuant to Section 3.  Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check,

COLORADO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3006 01/01                        Page 2 of 10                     DocMagic eFerms 800-649-1362
                                                                        www.docmagic.com

Identifier:7441328390          Doc Type:MTGR

treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower

Identifier:7441328390          Doc Type:MTGR

shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than
12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower
any Funds held by Lender.

4.  Charges; Liens.  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to
the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the
Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items
are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower:
(a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only
so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against
enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien
while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder
of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender
determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument,
Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given,
Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service
used by Lender in connection with this Loan.

5.  Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the
Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards
including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be
maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender
requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing
the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall
not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-
time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone
determination and certification services and subsequent charges each time remappings or similar changes occur which
reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of
any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone
determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at
Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount
of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's
equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater
or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so
obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed
by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These
amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest,
upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to
disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an
additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires,
Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any
form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such
policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss
payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make
proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any
insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration
or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.
During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender
has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction,
provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and
restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement
is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be
required to pay Borrower any interest or earnings on such proceeds.  Fees for public adjusters, or other third parties,
retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.
If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds
shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid
to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and
related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has
offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the
notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby
assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid
under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund
of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights

are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   Borrower's Loan Application.  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.   Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Identifier:7441328390        Doc Type:MTGR

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of

COLORADO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3006 01/01                          Page 6 of 10                          DocMagic eForms 800-649-1362
www.docmagic.com

Identifier:7441328390     Doc Type:MTGR

payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such

Identifier:7441328390          Doc Type:MTGR

other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the

Identifier:7441328390          Doc Type:MTGR

foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Lender shall mail a copy of the notice to Borrower as provided in Section 15. Trustee shall record a copy of the notice in the county in which the Property is located. Trustee shall publish a notice of sale for the time and in the manner provided by Applicable Law and shall mail copies of the notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's certificate describing the Property and the time the purchaser will be entitled to Trustee's deed. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall request that Trustee release this Security Instrument and shall produce for Trustee, duly cancelled, all notes evidencing debts secured by this Security Instrument. Trustee shall release this Security Instrument without further inquiry or liability. Borrower shall pay any recordation costs and the statutory Trustee's fees.

24. Waiver of Homestead. Borrower waives all right of homestead exemption in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
KENNETH R FISH                -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

Witness:                      Witness:

_____   _____

State of Colorado
County of  DENVER

The foregoing instrument was acknowledged before me this 11ᵗʰ day of April, 2006
by KENNETH R FISH



_____
Signature of Person Taking Acknowledgment

_____
Title

_____
Serial Number, if any

My commission expires:  1-9-2010

DocMagic℮Rom 800-649-1362
www.docmagic.com

Identifier:7441328390          Doc Type:MTGR

Loan Number: 6030181

Date: APRIL 11, 2006

Property Address: 500 HUDSON ST, DENVER, COLORADO 80220


## EXHIBIT "A"

## LEGAL DESCRIPTION


LOT 16, AND THE SOUTH 13 3/4 FEET OF LOT 17, BLOCK 2, MALONE AND DU BOIS SUBDIVISION, TOGETHER WITH THE WEST 1/2 OF THE NORTH 1/2 OF VACATED FIFTH AVENUE ADJOINING SAID LOT 16, CITY AND COUNTY OF DENVER, STATE OF COLORADO


A.P.N. # : 0607102005000

DocMagic *Remains* 800-649-1362
www.docmagic.com

Legal.cust

**FedEx Express US Airbill**

FedEx Tracking Number: 8630 6349 8402

| | |
|---|---|
| Date | 12-21-2007 |
| Sender's FedEx Account Number | 3974-5140-2 |
| Sender's Name | KENNETH FISH |
| Phone | (303) 321-8705 |
| Company | LAW OFFICES OF KENNETH R FISH |
| Address | 501 S CHERRY ST STE 610 |
| City | GLENDALE   State CO   ZIP 80246-1328 |

Your Internal Billing Reference    OPTIONAL

| | |
|---|---|
| Recipient's Name | |
| Phone | ( ) |
| Company | Homecomings Financial |
| Recipient's Address | 6716 Grade Lane, Building 9, Suite 910 |
| City | Louisville   State KY   ZIP 40213-1407 |

0369718244

**Find drop-off locations at fedex.com**
Simplify your shipping. Manage your account. Access all the tools you need.

---

MUR13

Form 0215    Sender's Copy

*EFILED Document*
*CO Denver County District Court 2nd JD*
*Filing Date: Jun 18 2010  4:47PM MDT*
*Filing ID: 31405864*
*Review Clerk: Stacey Johnson*

**4a Express Package Service** — *Packages up to 150 lbs.*

☒ FedEx Priority Overnight
☐ FedEx Standard Overnight
☐ FedEx First Overnight

**4b Express Freight Service**

☐ FedEx 1Day Freight
☐ FedEx 2Day Freight
☐ FedEx 3Day Freight

**5 Packaging**

☒ FedEx Envelope
☐ FedEx Pak
☐ FedEx Box
☐ FedEx Tube
☐ Other

**6 Special Handling**

☐ SATURDAY Delivery
☐ HOLD Weekday
☐ HOLD Saturday

Does this shipment contain dangerous goods?
☒ No   ☐ Yes   ☐ Yes   ☐ Dry Ice
☐ Cargo Aircraft Only

**7 Payment** Bill to:
☒ Sender   ☐ Recipient   ☐ Third Party   ☐ Credit Card   ☐ Cash/Check

| Total Packages | Total Weight | Total Declared Value |
|---|---|---|
| | | $ .00 |

**8 Residential Delivery Signature Options**

☐ No Signature Required   ☐ Direct Signature   ☐ Indirect Signature    519

---

RETAIN FOR YOUR RECORDS

1070

**American National Bank**
1-866-433-0202

368496

5-700
110

REMITTER   K. R. FISH

** DECEMBER 21, 2007

PAYABLE TO ***HOMECOMINGS FINANCIAL*** **************$10,239.06*****

**NON-NEGOTIABLE**

**OFFICIAL CHECK**

NOTICE TO CUSTOMER
If lost or stolen an indemnity bond may be required from insurance Co. before refunded.

ISSUED BY: MONEYGRAM PAYMENT SYSTEMS, INC., P.O. BOX 9476, MINNEAPOLIS, MN 55480
DRAWEE: BOSTON SAFE DEPOSIT & TRUST CO., BOSTON, MASSACHUSETTS

MEMORANDUM   FOR _____

P U R C H A S E R   R E C E I P T

---

EXHIBIT
C

*Law Offices of*
**Kenneth R. Fish**, LLC
ATTORNEYS AND COUNSELORS AT LAW
501 SOUTH CHERRY STREET,  SUITE 610
GLENDALE, COLORADO 80246

KENNETH R. FISH                          TELEPHONE (303) 321-8705                          EMAIL:  krfish@qwest.net
                                         FACSIMILE (303) 321-1248

December 21, 2007
**VIA FACSIMILE**
**And First Class Mail**

Ericka Olson, Esq.
Castle, Meinhold & Stawiarski, LLC
999 18th Street, Suite 2201
Denver, CO   80202

　　　　Re:  Homecomings Financial Loan No. 7441328390
　　　　　　Property Address:   500 Hudson Street
　　　　　　　　　　　　　　　Denver, CO  80220

Dear Ms. Olson:

　　　　As counsel for Homecomings, I am writing to advise that any claim of default under the Loan referenced above is disputed.  This date, certified funds for all principal, interest and late charges due on this account were express mailed to the office in Louisville, Kentucky as directed on my last statement.  The same should be delivered on the morning of Monday, December 24, 2007.  Also on this date, I was advised that this matter had been referred to your office December 19, 2007 for the commencement of foreclosure proceedings.

　　　　I attempted repeatedly to reach you or another attorney in your office by telephone today without success.  I did finally reach a non-attorney member of your staff who gave me your name and transferred me to your voicemail.  As you know from the message I left, by the time you return to your office on December 26, 2007, I will be out of Colorado and not back in my office until January 2, 2008.  Please give me a call on January 2 to discuss this matter further.  In the meantime, I assume no action will be taken to commence a Rule 120 or other proceeding in light of the information provided above.

　　　　　　　　　　　　　　Very truly yours,

　　　　　　　　　　　　　　Kenneth R. Fish

KRF/tf

EXHIBIT
D

```
                    **********************
                    ***   TX REPORT   ***
                    **********************


       TRANSMISSION OK

       TX/RX NO              0024
       RECIPIENT ADDRESS     3038651410
       DESTINATION ID
       ST. TIME              12/21 16:56
       TIME USE              00'51
       PAGES SENT            2
       RESULT                OK
```

*Law Offices of*
## KENNETH R. FISH, LLC
### ATTORNEYS AND COUNSELORS AT LAW
501 South Cherry Street, Suite 610
Glendale, Colorado 80246
Phone: (303) 321-8705 - Fax: (303) 321-1248

---

### FACSIMILE COVER SHEET

NAME:        Ericka Olson, Esq.
             Castle, Meinhold & Stawiarski, LLC

FAX PHONE:   303-865-1410

FROM:        **Ken Fish**

DATE:

SUBJECT:     Homecomings Acct. 744132390

TIME:        4:50 p.m.(MST)

No. of pages including cover sheet 2

### MESSAGE
**Please see following letter.  Original will follow via first class mail.**

### CONFIDENTIALITY NOTICE
The information contained in or attached to this telecopy transmission is intended

## Ken Fish

| | |
|---|---|
| **From:** | Ken Fish [krfish@qwest.net] |
| **Sent:** | Tuesday, January 22, 2008 2:51 PM |
| **To:** | 'eolson@cmsatty.com' |
| **Subject:** | Homecomings Financial |

**Attachments:** 1-14-08 Homecomings email.pdf

Dear Ms. Olson

Approximately 90 minutes ago, I received an automated telephone call from your client claiming that my payment for January, 2008 is twenty days late and the sum of $4153.74 is due. As you know, I have been trying to get some accounting as to the alleged amount due since December 21. Last week (January 16), you called to tell me that my January payment was apparently $436.37 short and you understood that I had remitted only $2792.62. I explained that was in error and e-mailed you a copy of the check paid through my bank January 2. We also discussed that on January 14, I had received an e-mail stating that my January payment had not been received. A copy of that e-mail is attached. You will note that it advised, "If your payment has already been sent . . . please disregard this notice." Knowing my payment had already been sent and cleared by my bank, I ignored the notice until receiving an automated call on January 15 stating that my January payment in the amount of $3313.99 was now 14 days past due. On January 16, I called the Customer Service number and eventually spoke with an individual who stated his name to be "Rein." Rein confirmed that my December 26, 2007 check had indeed been received but then stated that I still owed $521.37. When I asked, "For what," the line went dead. Shortly thereafter, you called and we had the discussion described above regarding an alleged $436.37 shortfall. You agreed to request and provide me an accounting after I provided you a copy of my check. Instead of an accounting, my next communication came from the Public Trustee's Office advising that a sale of my home is scheduled for February 28. Given our conversation on January 3 regarding your December 31, 2007 client instructions to "close and bill," which you told me that meant, in part, there would be no foreclosure, I was more than a little upset. I called you yesterday, we discussed this latest development over the week end, I offered to send you the $436.37 pending further discussions, and you suggested I "sit tight" while you attempted to get additional information. As uncomfortable as it has been, I did "sit tight" until this latest call claiming I owe over 4100 dollars. I have had no problem with my obligation to respect and meet your client's legitimate expectations. Since December 21, my actions have all been directed at doing so. It is becoming more and more difficult to deal with what seems to be an ever-changing and totally unexplained series of demands.

Please give this matter immediate attention and advise me of your client's basis for these claims.

Kenneth R. Fish
Law Offices of Kenneth R. Fish, LLC
501 South Cherry Street, Suite 610
Glendale, CO   80246
Tel: 303-321-8705
Fax: 303-321-1248

This email and any files transmitted with it are confidential and intended solely for the individual or entity to whom it is addressed. If you have received this email in error, please notify the sender nd do not disseminate, distribute, copy or save the email or any attached file or document.

EXHIBIT
E

## Ken Fish

| | |
|---|---|
| **From:** | Ken Fish [krfish@qwest.net] |
| **Sent:** | Tuesday, February 26, 2008 9:31 AM |
| **To:** | 'Ericka Olson' |
| **Subject:** | Homecomings Financial - 500 Hudson |
| **Importance:** | High |

Dear Ms. Olson:

Yesterday, I had a call from and lengthy conversation with "Ramona," a representative of your client at extension 8746562. She shared with me some distressing information regarding the reasons I continue to receive calls that my monthly payments have not been received despite the fact I have mailed the same early for each month this year. Specifically, she explained that the information she has is that although payments I have submitted, $10,239.06 on December 21, 2007, $3228.99 on December 26, 2007 and $3228.99 on January 28, 2008 were received, **$2,013.40 of the same was paid to your firm rather than applied to my account.** If her information is correct, that is totally unacceptable and must be immediately rectified. Only you or your firm have knowledge or readily available records as to how much and for what Homecomings has been billed in relation to my account. Given the information I do have indicating: this file was not referred to your office until December 19; I contacted your office and learned no action had been taken as of December 21; I wrote to you and left a voice message for you on December 21; and, my cashier's check for all payments and late fees through December was delivered to your client on December 22, there is absolutely no way reasonable fees earned, if any, could approach $2,000. This must have your immediate attention.
Ken Fish

Kenneth R. Fish
Law Offices of Kenneth R. Fish, LLC
501 South Cherry Street, Suite 610
Glendale, CO  80246
Tel: 303-321-8705
Fax: 303-321-1248

This email and any files transmitted with it are confidential and intended solely for the individual or entity to whom it is addressed. If you have received this email in error, please notify the sender nd do not disseminate, distribute, copy or save the email or any attached file or document.

EXHIBIT
F